COURT OF CHANCERY
OF THE
STATE OF DELAWARE

MORGAN T. ZURN
  MASTER IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report:  June 8, 2017
Date Submitted:  March 17, 2017

David A. Boswell, Esquire
Hudson Jones Jaywork & Fisher, LLC
18354 Coastal Highway
Rehoboth Beach, DE 19971

Mr. Robert L. Moore, Jr.,
P.O.A. for Martha M. Landon
14052 Union Street Ext.
Milton, DE 19968
robertlmoore@netzero.com

Ms. Martha Landon
1125 Milford-Harrington Highway
Milford, DE 19963

Re:  *IMO John T. Landon, Jr. Estate*
     C.A. No. 5230-MZ

Dear Counsel and Litigants:

When John T. Landon Jr., passed away, his testamentary documents left his second wife a life estate in several real properties and named his children by his first marriage as remaindermen.  Two of those children are the current executors of the estate.  The second wife and children have been involved in litigation since 2006.  Pending before me is the executors' motion to enforce a settlement agreement.  For the reasons that follow, I find there is an enforceable settlement agreement because the parties agreed on all the essential terms.  I therefore recommend the Court grant the executors' motion.

## I. Background

John T. Landon Jr. (the "Decedent") died on March 30, 2006. The documents reflecting the Decedent's testamentary plan include a last will and testament dated September 28, 1994 (the "Will"), the first codicil dated June 10, 1996 (the "First Codicil"), the second codicil dated January 16, 2002 (the "Second Codicil"), and the third codicil dated October 26, 2005 (the "Third Codicil") (collectively, the "Testamentary Documents"). The Decedent was survived by his wife, Martha Landon ("Martha"),[1] who he married in November 1992. The Decedent also was survived by five children from a previous marriage: Keith Landon ("Keith"), Ann Richter ("Ann"), Byron Landon ("Byron"),[2] William Landon ("William"), and John T. Landon III ("Tommy"). The Will appointed Keith and Ann as co-executors of the Decedent's estate (the "Estate").

The bulk of the Estate is comprised of five parcels of land and some personal property, along with certain debts that were owed to the Decedent. The parcels of land (and improvements thereon) consist of: (1) a residential property in Sussex County the parties call "Tommy's Home," (2) a lot consisting of 4.9 acres the parties call "Keith's Nassau Lot," (3) a residential property in Kent County the

---

[1] Because some of the parties share the same last name, their first names have been used for purposes of this report. No disrespect is intended.
[2] Byron died shortly after the Decedent and is survived by his wife and two children.

parties call the "Milford Residence," (4) a lot in Sussex County the parties call the "Billboard Lot," and (5) another lot in Sussex County the parties call the "Adjacent Lot."

The Decedent made a number of specific bequests in the Testamentary Documents, including bequests of all of his real property. Among other things, the Decedent devised to Martha life estates in the Milford Residence, the Billboard Lot, and the Adjacent Lot, and devised the remainder interests in those three properties among his various children.

The Will contained a clause apparently intended to dissuade beneficiaries from contesting the Testamentary Documents. That clause was deleted and revised by the Third Codicil. The clause (the "No-Contest Clause") contained in the Third Codicil provides:

> Should any person entitled to share in my estate either as an heir at law or a legatee or devisee under this Will contest or oppose or seek to set aside this Will or establish any legal right to share in my estate other than as herein approved and provided, or if any such person shall violate my wife's right to quiet enjoyment, as legally defined, of any real property and any income therefrom bequeathed to her by me, or shall claim a right to any income from investments which I have bequeathed to her, I hereby give and bequeath to each such person the sum of ONE DOLLAR ($1.00) only, and expressly direct that he or she shall receive no other or further share in my estate to the extent any such interest in my estate is continuing, and the share to which any such person might otherwise have been entitled had he or she not participated in such contest or opposition, or participated in any violation of my wife's quiet enjoyment, I give, devise and bequeath

such person's share to the AVENUE UNITED METHODIST CHURCH, of Milford, Delaware.[3]

On November 30, 2006, Martha filed a lawsuit (the "Billboard Lawsuit") in this Court against Keith and Byron, in which she sought a constructive or resulting trust over the Billboard Lot.[4] Martha asserted the Billboard Lot was marital property because it was purchased during the marriage using a combination of funds from the spouses' joint account and funds obtained through a mortgage that was paid with funds from the joint account. Martha alleged that, upon the Decedent's death and by operation of law, she now owned the property outright as the surviving spouse. Martha voluntarily dismissed the Billboard Action in June 2007.

The Executors began this action in 2010, seeking instructions regarding the proper distribution of the Estate. The Executors' Petition for Instructions asserts that the Billboard Lawsuit ran afoul of the No-Contest Clause, and seeks instructions regarding the proper distribution of the bequests to Martha of life estates in certain real and personal property, along with lifetime interests in the principal and interest due on certain loans payable to the Decedent. The Petition

---

[3] Pet. ¶ 10 & Ex. A. Exhibit A to the Petition for Instructions appears to contain an incomplete copy of the Third Codicil. The foregoing recitation of the final sentence of the No-Contest Clause therefore is drawn from the Petition for Instructions.

[4] C.A. No. 2582-MA.

for Instructions also seeks additional instructions regarding whether a mortgage Decedent obtained on the Milford Residence is a debt of the Estate, whether Martha's claim against the Estate for funeral expenses is valid, whether Martha properly has a claim for a spousal allowance, and whether Ann continues to be obligated to the Estate for a mortgage the Decedent held on Ann's home, as well as instructions regarding the order of abatement or sale of the Decedent's property to the extent necessary to pay debts against the Estate.

The parties engaged in discovery and motion practice. In the summer of 2015, the parties twice agreed to extend pretrial deadlines in order to allow for continued settlement discussions.

The Executors filed the pending motion to enforce a settlement agreement ("Motion") on August 12, 2015. The Motion required Martha and the Executors to obtain substitute counsel to litigate the Motion, as their counsel to date would necessarily serve as witnesses in connection with the Motion. Martha sought and received several continuances to obtain substitute counsel, but ultimately proceeded without the benefit of counsel.[5] Martha responded to the Motion on

---

[5] Docket Item 105, dated Nov. 3, 2015; Docket Item 108, dated Nov. 24, 2015; Docket Item 111, dated May 17, 2016 (providing Martha had identified replacement counsel but had not yet retained them); Docket Item 112, dated July 1, 2016 (moving to withdraw as Martha's counsel as Martha had not heeded former counsel's recommendations and advice in retaining replacement counsel).

October 17, 2016.[6]  The Executors did not file a reply.  I held an evidentiary

hearing on March 17, 2017.  This is my final report.

## II.     Analysis

The Executors contend they and Martha reached a settlement agreement in

July 2015, and seek enforcement of that agreement.  Martha disagrees.  Delaware

courts encourage negotiated resolutions to contested cases, and for that reason,

among many others, settlement agreements are enforceable as a contract.[7]  As the

parties seeking to enforce an alleged agreement, the Executors bear the burden of

proving the existence of a contract by a preponderance of the evidence.[8]  In

determining whether the Executors have met their burden, I must inquire:

> whether a reasonable negotiator in the position of one asserting the
> existence of a contract would have concluded, in that setting, that the
> agreement reached constituted agreement on all of the terms that the
> parties themselves regarded as essential and thus that that agreement
> concluded the negotiations.[9]

---

[6] Martha's *pro se* response included a pleading signed by one of her sons, Robert L. Moore Jr. ("Robert") as Martha's power of attorney, an affidavit signed by Martha, and an affidavit signed by another son, John T. Moore ("John").  Docket Item 115.  At the hearing, Robert indicated he wished to litigate on Martha's behalf as her power of attorney.  *See* Docket Item 114.  The Executors objected.  I concluded that Robert's intended representation of Martha would constitute the unauthorized practice of law and was impermissible.  *See Snyder v. Martin*, 820 A.2d 390, 392-93 (Del. Fam. Ct. 2001) ("[T]he Courts of this State … must prohibit the lay person from taking on the function of an attorney at law under the guise of a document which makes that lay person an attorney-in-fact.").  Robert and John assisted Martha in proceeding *pro se*.

[7] *Schwartz v. Chase,* 2010 WL 2601608, at *4 (Del. Ch. Jun. 29, 2010); *Asten, Inc. v. Wangner Sys. Corp.,* 1999 WL 803965, at *1 (Del. Ch. Sept. 23, 1999).

[8] *Schwartz,* 2010 WL 2601608 at *4.

[9] *Id.*

Overt manifestations of assent control over subjective intent.[10]

The relevant settlement discussions began in July 2014. Martha's counsel, Bruce A. Rogers, Esquire ("Rogers"), suggested potential terms for resolving the case to both Martha and the Executors' litigation counsel, David A. Boswell, Esquire ("Boswell").[11] Among other terms, Rogers suggested payment of the Decedent's funeral bill (although Rogers' letter did not specify the payor(s)), that the heirs return all personal property to Martha, that Martha have quiet enjoyment of the Milford Residence, that the heirs repair the roof of and insure the Milford Residence, that Martha receive rental income from other properties "as heretofore," and that Martha pay a "reasonable amount" of interest on a home equity line of credit secured by the Milford Residence that was used to purchase a different property. This suggestion did not gain traction.

The next settlement proposal came from the attorney handling the administration of the Estate, Stephen P. Ellis, Esquire. In response, on March 24, 2015, Rogers conveyed a "counter-offer of settlement" for the Executors' consideration.[12] Rogers' counteroffer proposed Martha would receive the Milford

---

[10] *United Health All., LLC v. United Med., LLC*, 2013 WL 6383026, at *6 (Del. Ch. Nov. 27, 2013).
[11] Pet'rs Hr'g Ex. P1; Hr'g Tr. 49.
[12] Pet'rs Hr'g Ex. P2.

Residence as her free and clear property; the heirs would be responsible for the home equity line of credit; Martha would receive rental income from the Billboard Property; and upon Martha's death, the Milford Residence would be conveyed to Martha's sons and Ann.

Boswell rejected Rogers' counteroffer and made "another settlement proposal" via letter dated June 23, 2015.[13] Boswell proposed Martha would purchase the Milford Residence at a price adjusted for assuming the home equity line of credit, the actuarial value of her life estate in the Milford Residence, and her life estate in the Billboard Lot and Adjacent Lot, which she would convey to the heirs. Boswell also proposed that Ann would exchange her claim to the personal property at the Milford Residence for $25,000 so long as she received family photographs. Boswell's proposal did not address the Decedent's funeral bill.

Rogers responded with a "counter proposal" dated July 16, 2015.[14] Rogers proposed that Martha assume the home equity line of credit and take the Milford Residence free and clear, and release rental income from the other properties. Rogers testified that Martha authorized this proposal.[15] Rogers suggested that Ann list items of personal property she wanted from the Milford Residence, and that

---

[13] Pet'rs Hr'g Ex. P3.
[14] Pet'rs Hr'g Ex. P4.
[15] Hr'g Tr. 114, 116.

upon agreement, those items would be transferred without any equalizing payment.

Finally, Rogers proposed Martha would release the Estate "upon payment of the

funeral bill of Mr. Landon by the estate."

When Boswell received this proposal, he concluded "the big issues had been

resolved," meaning the life estate and remainder interests on the properties, and the

only remaining issues were the funeral bill, personal property, and the scope of

releases.[16]  Boswell and Rogers agreed Martha's release would be as to not only

the Estate, but also its personal representatives and remaindermen.[17]  The next day,

Rogers and Boswell submitted a joint stipulated scheduling order postponing

looming pretrial deadlines to allow for continued settlement negotiation.[18]  Rogers

and Boswell informed the Court that "[t]he parties have come a long way towards

settlement, and are now trying to work out only minor details such as personal

property in the Milford residence, and the funeral bill.  The parties hope to reach a

settlement within the next few business days."

Boswell formally responded to Rogers' July 16 proposal via a July 17 letter,

in which he stated his clients were "generally amenable" and proposed "minor

---

[16] Hr'g Tr. 72-74; *see* Pet'rs Hr'g Ex. P5 (including Boswell's response, "It looks like the parties are fairly close at last.").
[17] Hr'g Tr. 74-75.
[18] Pet'rs Hr'g Ex. P5; Docket Item 79.

clarifications" and details as to the mechanics of the agreed-upon terms.[19]  Boswell accepted Rogers' proposal with regard to the Milford Residence, home equity line of credit, and rental income.  He provided Ann's list of requested personal property, such that all that remained was Martha's approval of that list.  Finally, Boswell documented his conversation with Rogers in which Rogers had advised he believed Martha might be willing to split the funeral bill and that Rogers would seek her authority on that point.

On July 21, 2015, Rogers advised Boswell that the property list was no longer an issue.[20]  Rogers also advised Boswell that Martha was in fact willing to pay half of the Decedent's funeral expenses.  Martha told the funeral director that she and the estate were working towards a compromise in which they would split the bill evenly.[21]  Boswell updated his July 17 proposal on July 22 to document that agreement.[22]  The July 22 letter had a space for Martha to sign to indicate acceptance.  Boswell requested a response within two days.

After Rogers had proposed that Martha assume the home equity line of credit and release the income streams, and after Boswell had accepted that

---

[19] Pet'rs Hr'g Ex. P7.
[20] Pet'rs Hr'g Ex. P9; Pet'rs Hr'g Ex. P10, p. 14 ll. 20-21 ("Mr. Rogers:  They provided a list of personal property, and she was okay with that."); Hr'g Tr. 96-97.
[21] Hr'g Tr. 42, 44, 47.
[22] Pet'rs Hr'g Ex. P8.

proposal, Martha and her sons thought that Martha should receive the rental income after all so that she could carry the line of credit more easily. On July 20, Martha and John visited a bank to discuss Martha's ability to carry the home equity line of credit.[23] They concluded Martha would be impoverished by carrying the line of credit without the rental income.[24]

Martha and one of her sons discussed this with Rogers.[25] Rogers "was advised there was a desire to modify the counter offer so that Ms. Landon would receive income from the rental of the billboard for her life."[26] On July 25, Rogers informed Boswell of this development, which he attributed to the "involvement of third parties," but indicated he was recommending Martha accept Boswell's July 22 proposal and believed she would do so the following week.[27] Boswell understood Rogers to be saying that Martha was in agreement but her sons "were pulling in different directions."[28] Martha neither formalized any demand for rental income nor signed Boswell's July 22 letter.

---

[23] Resp. Hr'g Ex. A; Hr'g Tr. 132.

[24] Resp. Hr'g Ex. A; Hr'g Tr. 132.

[25] John affirmed to the Court that he spoke with Rogers on July 21, 2015, and informed him Martha rejected the Executors' offer. Resp. Hr'g Ex. A. Rogers' contemporaneous emails indicate he spoke with Martha and one of her sons for almost two hours on July 24, 2015. Pet'rs Hr'g Ex. P9.

[26] Pet'rs Hr'g Ex. P9.

[27] Pet'rs Hr'g Ex. P9.

[28] Hr'g Tr. 96.

On August 4, 2015, the parties agreed to extensions of pretrial deadlines and stipulated as follows:

> The parties have come a very long way towards settlement, and only one issue remains to be resolved.  The parties hope to reach a settlement within the next two days.
> …
> The parties agree to hold additional settlement discussions without further delay, and to make every possible effort to resolve this matter no later than 5 pm on Friday, August 7, 2015.[29]

The Motion followed on August 12, 2015.

At the evidentiary hearing, Martha, who was eighty-two years old at the time, repeatedly testified she had no memory of speaking with her attorney about this case.[30]  She could not offer any testimony that informed the issues raised in the Motion.  Her affidavit submitted in response to the Motion was similarly devoid of any argument specific to settlement.  Her affidavit and testimony asserted only general positions with regard to the Decedent's testamentary intent and plan.

I conclude that a reasonable negotiator in the Executors' position would have concluded that they reached agreement with Martha on all terms the parties regarded as essential, and thus that the agreement concluded the negotiations.[31]  By July 16, 2015, the parties had agreed to the most significant terms – the ownership

---

[29] Docket Item 88.
[30] Hr'g Tr. 21, 23, 24, 26.
[31] See Schwartz, 2010 WL 2601608 at *4.

of the Milford Residence, the assumption of the Milford Residence's home equity

line of credit, and the recipient of rental income from other properties – and were

still negotiating only the funeral bill and the distribution of personal property

between Ann and Martha.  On July 17, Ann provided a list of personal property she

wanted, and on July 21, Rogers advised Boswell that Martha agreed to that list.

Between July 17 and July 21, Rogers also advised Boswell that Martha agreed to

pay half the Decedent's funeral expenses, and the Executors agreed to pay the

other half.  Martha further manifested her assent to paying half the funeral bill in a

conversation with the funeral director.  By July 21, 2015, the parties had agreed to

all essential terms.

The only sources of equivocation are the fact that Martha never signed

Boswell's July 22 letter, and the concern about the rental income raised by Martha

and her sons on or after July 21.  Boswell's July 22 letter included a place for

Martha to sign, and Rogers testified that Boswell had requested Martha's signature

to indicate acceptance of the agreement.[32]  Martha did not sign.

> Where a settlement agreement has been reached, the fact, alone, that it
> was the understanding that the contract should be formally drawn up
> and executed, does not leave the transaction incomplete and without
> binding force, in the absence of a *positive agreement* that it should not
> be binding until so reduced to writing and formally executed.

---

[32] Pet'rs Hr'g Ex. P8; Hr'g Tr. 141-43.

> Therefore, the question is whether the parties positively agreed that there will be no binding contract until the document is executed.[33]

Boswell's request falls short of proof that that the parties considered Martha's signature to be a necessary precedent to making the settlement agreement final and binding. I conclude the absence of Martha's signature does not preclude an enforceable settlement agreement.

Martha's doubt about releasing the rental income came too late to preclude an enforceable settlement agreement. Rogers, with Martha's authority, offered to assume the home equity line of credit and release the rental income on July 16, 2015.[34] Boswell formally accepted that offer on July 17.[35] At that point, as Rogers and Boswell told the Court, the only remaining issues were "minor details such as personal property in the Milford residence, and the funeral bill."[36] The personal property was resolved on July 21, 2015, and the funeral bill was resolved on July 21 or 22. That agreement was documented in Boswell's July 22 letter.[37] The discussion among Martha, her son, and Rogers regarding the rental income occurred after Rogers and Boswell agreed to all essential terms on behalf of their

---

[33] *Whittington v. Dragon Croup LLC*, 2013 WL 1821615, at *3 (Del. Ch. May 1, 2013) (internal citations and quotations omitted).
[34] Pet'rs Hr'g Ex. P4.
[35] Pet'rs Hr'g Ex. P7.
[36] Pet'rs Hr'g Ex. P5; Docket Item 79; Hr'g Tr. 76-77.
[37] Pet'rs Hr'g Ex. P8.

clients. Martha's overt manifestations of assent – her counsel's explicit and authorized agreement to all essential terms and her statement to the funeral director that she would pay half the burial costs – control over subjective doubt later held by Martha or her sons. Martha's doubts were never conveyed to Boswell as a formal demand; to the contrary, Rogers told Boswell that Rogers continued to recommend the settlement terms and believed Martha would "get to that point" in a matter of days.[38]

Martha was already at that point. The record shows Martha authorized Rogers to offer assumption of the line of credit with release of the income stream, and that Martha assented to Ann's requested personal property and to pay half the funeral cost. There is no evidence that Martha's authorization or assent was in any way compromised or ineffective; Martha's present inability to recall the settlement negotiations does not invalidate them. The record indicates that third parties might have cast doubt on Martha's conclusions after the fact. This is insufficient to disturb the agreement between Martha and the Executors. The Executors have proven that they and Martha reached agreement on all of the terms that the parties regarded as essential.

---

[38] Pet'rs Hr'g Ex. P9.

**III.  Conclusion**

For the foregoing reasons, I recommend this Court grant the Executors'

motion to enforce a settlement agreement.  This is a final report pursuant to Court

of Chancery Rule 144.

Respectfully,

/s/ *Morgan T. Zurn*

Master in Chancery